UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

MATTHEW CARON

      Plaintiff,

v.

MACMULKIN CHEVROLET, INC. d/b/a
THOMPSON AUTOMOTIVE GROUP

      Defendant.

Case No. 1:22-CV-00278

FIRST AMENDED COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES Plaintiff Matthew Caron ("Plaintiff" or "Caron") and complains against Defendant, MacMulkin Chevrolet, Inc. d/b/a Thompson Automotive Group ("Defendant" or "TAG") as follows:

INTRODUCTION

1. This case arises under the Emergency Paid Sick Leave Act ("EPSLA") section of the Family First Coronavirus Relief Act ("FFCRA"), which provides that, "It shall be unlawful for any employer to discharge, discipline, or in any other manner discriminate against any employee who…takes leave in accordance with this Act." PL 116-127, March 18, 2020, 134 Stat 178. Defendant violated the law by terminating Caron for using leave protected by the law and for complying with the COVID-19 protocols established by the United States and New Hampshire.

2. Defendant further interfered with and retaliated against Caron for exercising his rights under the Family Medical Leave Act ("FMLA") 29 U.S.C. § 2601 *et seq*.

3. Caron was discriminated against because of disability and because he was regarded as disabled under the Americans with Disabilities Act ("ADA"),42 U.S.C. §§ 12101*et seq*

1

and the New Hampshire Law Against Discrimination ("Law Against Discrimination"), RSA 354-A, *et seq*. Defendant also violated these laws by failing to provide reasonable accommodations for Caron's disabilities such as leave and the ability to sit at work on occasion and by terminating him for requesting and needing accommodation.

## JURISDICTION AND PARTIES

4. Matthew Caron is a United States citizen residing in the Town of Merrimack, County of Hillsborough, New Hampshire

5. MacMulkin Chevrolet, Inc. d/b/a Thompson Automotive Group is a foreign profit corporation with a principal place of business in the City of Nashua, County of Hillsborough, New Hampshire.

6. Defendant is an "employer" as that term is used in the EPSLA, FFCRA, FMLA, ADA, and RSA 354-A.

7. At all relevant times to this case, Defendant employed more than 50 employees within 75 miles of the location at which Caron worked.

8. This Court has subject matter jurisdiction over Plaintiff's federal and state claims pursuant to 28 U.S.C. §§ 1331 and 1367.

9. On or around May 28, 2021, Plaintiff filed a timely Complaint of Discrimination against Defendant alleging violations of EPSLA, FFCRA, FMLA, ADA, and RSA 354-A.

10. On July 25, 2022, Plaintiff received notices of closure from the NHCHR and EEOC.

11. Plaintiff has exhausted his administrative remedies with respect to all claims set forth in this Complaint that requires administrative exhaustion.

## JURY TRIAL REQUESTED

12. Plaintiff requests a trial by jury for all claims and issues for which a jury is permitted.

## FACTS

13. Defendant hired Caron as a Parts Specialist on or around May 8, 2017.

14. Several years before Caron started working for Defendant, he began to suffer from chronic migraine headaches.

15. Caron's migraine headaches require medical care and must be managed by use of prescription medication.

16. Caron's migraine headaches, particularly when his symptoms flare, substantially limit his ability to perform a variety of major life activities including, but not limited to, neurological functioning. *See* 29 C.F.R. § 1630.2(h)(2)(ii).

17. Caron had knee surgery ten years ago in order to repair torn cartilage in his left knee.

18. Caron's right knee required surgical repair for the same reason when he was terminated by Defendant.

19. Caron's knee condition, particularly when his symptoms flare, and prior to surgical repair, substantially limited his ability to perform a variety of major life activities including, but not limited to, musculoskeletal functioning. See 29 C.F.R. § 1630.2(h)(2)(ii).

20. Caron's conditions were disabilities for purposes of the ADA and RSA-354-A.

21. Defendant also regarded Caron as a person with a disability under these laws.

22. Caron's son, who is under the age of 18, has a variety of mental health conditions including, but not limited to, autism and intellectual disabilities and requires assistance with basic medical, hygienic, nutritional and safety needs.

23. Caron is protected under the FMLA to take time to care for his son, who has a serious health condition.

24. Throughout his employment at Defendant, Caron was intermittently absent from work and used personal time due to his migraine headaches, his knee condition, and his son's disabilities.

25. In light of these absences, Caron often worked on his days off in order to compensate for time.

26. Defendant's Operations Manager, Arthur St. Denis ("St. Denis"), was aware that Caron's intermittent absences were due to Caron's migraine headaches, knee condition, and caring for his son.

27. Caron's intermittent absences due to Caron's migraine headaches and his knee condition were protected absences under the FMLA, ADA, and RSA-354-A.

28. Caron's intermittent absences to care for his son were protected under the FMLA.

29. In addition to absences for the above health conditions, during the summer of 2020, Caron was out of work from May 20 through June 14 while he quarantined in accordance with State requirements after he had been in close contact with a Defendant employee who tested positive for COVID-19.

30. During this period, Caron had a slight fever, chills, and issues breathing.

31. St. Denis was aware that his absence from May 20 through June 14 was due to quarantine in accordance with State requirements.

32. In order to repair his right knee, Caron planned to have surgery sometime in early 2021 and take leave from work.

33. Caron would have been entitled to take leave under the FMLA, ADA, and RSA-354-A to repair his right knee.

34. Caron's surgery was performed in April 2021 after Defendant unlawfully terminated him.

35. Caron told St. Denis about his knee condition when he began experiencing pain in or around January 2020.

36. Throughout 2020, Caron provided St. Denis with updates about his care, including sharing the results of the MRI that found that he had a torn meniscus and that he required surgery.

37. Caron told St. Denis that he could not schedule surgery until the following year due to the pandemic.

38. In or around September 2020, Caron spoke to Defendant's Parts Manager, Tom Finn ("Finn") and asked to be able to sit at a desk while he worked as a reasonable accommodation for his knee condition.

39. Though parts counter employees had been allowed to sit on stools in the past, Caron was informed, by Finn, that stools had been taken away due to another employee sitting too much. Finn told Caron that stools would be returned when "the point is proven."

40. While Caron was denied an accommodation and required to stand throughout the day, others were permitted to use stools and sit in chairs while performing their job duties.

41. In or around November, 2020, Caron was pulled aside by St. Denis and Finn and verbally warned about his attendance. The absences at issue were protected by the FMLA, ADA, and RSA-354-A.

42. On November 29, 2020, Caron began to experience flu like symptoms.

43. On November 30, 2020, Caron was informed that another coworker, who he had worked with closely, left work to be tested and quarantined after he had been in close contact with a family member of his who had tested positive for COVID-19.

44. On December 1, 2020, Caron texted St. Denis, stating that he would be out of work due to flu like symptoms and a fever. Caron notified St. Denis that he would be taking a COVID-19 test.

45. On December 2, 2020, Caron went to his doctor in the afternoon and had a Rapid COVID-19 test.

46. Caron was informed that his results were negative, however, because he was symptomatic, he was instructed, by his doctor, to quarantine for 14 days from that day.

47. Because Caron was instructed by his doctor to self-quarantine for 14 days for reasons related to COVID-19, Caron had a "need for leave" in accordance with EPSLA.

48. Caron's doctor provided a note stating that he should return to work on Wednesday, December 17, 2020, after the 14-day quarantine period.

49. On or around December 2, 2020, Caron texted copies of the doctor's note and test result to St. Denis and made him aware that Caron would continue to quarantine in accordance with his doctor's orders and State quarantine guidelines.

50. Because Caron was instructed by his doctor to self-quarantine for 14 days for reasons related to COVID-19, Caron's absence was protected under EPSLA.

51. Between December 3rd and December 7th, Caron continued to experience flu like symptoms and remained out of work per his doctor's orders and State quarantine guidelines.

52. On December 8, 2020, St. Denis reached out to Caron and stated that because the State of New Hampshire changed the quarantine time from 14 days to 10 days, he could come back to work on Thursday December 10th, 2020, 10 days from the first day he was out.

53. Caron reminded St. Denis that his doctor had advised him that he quarantine until December 17, 2020.

54. Because Caron was instructed by his doctor to self-quarantine for 14 days for reasons related to COVID-19, Caron's absence was protected under EPSLA.

55. Caron's doctor advised him to have another COVID-19 test before returning to work.

56. Caron set an appointment for a COVID-19 test at St. Joseph's hospital in Nashua, NH, for December 9, 2020.

57. On December 9, 2020, while Caron waited to take a COVID-19 test, he received a text message from St. Denis asking Caron to call when able.

58. After Caron's COVID-19 test, he spoke with St. Denis.

59. St. Denis asked about Caron's COVID-19 test.

60. Caron explained to St. Denis that the nurse advised that the results would be released in 48 hours.

61. Because Caron was experiencing COVID-19 symptoms and was seeking a medical diagnosis, Caron's absence was protected by EPSLA.

62. His absence was protected by the FMLA as well.

63. St. Denis then told Caron, "I want to let you know we won't be needing you back, you are fired."

64. St. Denis stated that the reason for Caron's termination was "attendance issues."

65. Caron received no progressive discipline or warnings related to his absences.

66. While in quarantine, Caron asked his operations manager about pay in accordance with FFCRA. Caron was advised to file for unemployment.

67. Caron did not receive FFCRA pay from his employer while out on quarantine leave.

68. On December 28, 2020, Caron had not received his final paycheck from Defendant.

69. Caron filed a wage claim with the NH Board of Labor.

70. On December 31, 2020, Caron received his final two paychecks in the mail.

71. Defendant acknowledged that Caron's termination was the result of taking leave relating to COVID-19.

72. The purpose of EPSLA is to obviate the pressure on employees "to choose between their paycheck and their health." 166 CONG. REC. H1675-09, H1689 (daily ed. Mar. 13, 2020) (statement of Rep. Scott).

73. Defendant unlawfully terminated Caron for taking leave in accordance with EPSLA.

74. Defendant further interfered with Caron's rights under the FMLA and retaliated against him for exercising his FMLA rights.

75. Defendant discriminated against Caron on the basis of his disability, discriminated against him because he was regarded as disabled, and denied him a reasonable accommodation in violation of the ADA and RSA 354-A:7.

76. Defendant's statement that Caron was terminated for absences is an admission that Caron was terminated because of absences that were protected by the FMLA, ADA, RSA-354-A, and EPSLA.

COUNT I
Violations of EPSLA and FFCRA

77. Paragraphs 1-76 are incorporated by reference.

78. The Emergency Paid Sick Leave Act ("EPSLA") section of the Family First Coronavirus Relief Act ("FFCRA"), provides that, "It shall be unlawful for any employer to discharge, discipline, or in any other manner discriminate against any employee who…takes leave in accordance with this Act." PL 116-127, March 18, 2020, 134 Stat 178.

79. Defendant violated the EPSLA when it discriminated and retaliated against Caron by unlawfully terminating him for complying with the COVID-19 protocols directed by the United States and New Hampshire.

## COUNT II
## Violations of FMLA

80. Paragraphs 1 – 79 are incorporated by reference.

81. The FMLA makes it unlawful for an employer to interfere with or retaliate against an employee for exercising rights under the FMLA.

82. Defendant interfered with and retaliated against Plaintiff for exercising his rights under the FMLA.

## COUNT III
## Violations of RSA § 354-A

83. Paragraphs 1 - 82 are incorporated by reference.

84. Defendant violated RSA 354-A by engaging in unlawful disability discrimination, unlawful retaliation, and failure to accommodate.

## COUNT IV
## Violations of the ADA

85. Paragraphs 1 – 84 are incorporated by reference.

86. Defendant violated the ADA by engaging in unlawful disability discrimination, unlawful retaliation, and failure to accommodate.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

      A.      Declare the conduct engaged in by Defendant to be in violation of his rights;

      B.      Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

      C.      Award equitable-relief for back pay, benefits and prejudgment interest;

      D.      Award compensatory damages in an amount to be determined at trial;

      E.      Award punitive damages in an amount to be determined at trial;

      F.      Award liquidated damages in an amount to be determined at trial;

      G.      Award nominal damages;

      H.      Award attorney's fees, including legal expenses, and costs;

      I.      Award prejudgment interest;

      J.      Permanently enjoin Defendant from engaging in any employment practices that violate the New Hampshire Human Rights Act, the ADA, EPSLA, FFCRA, and the FMLA;

      K.      Require the leadership of Defendant to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate retaliation or discrimination in the future;

      L.      Require that Defendant post a notice in all of their workplaces of the verdict and a copy of the Court's order for injunctive relief;

      M.      Require that Defendant train all management level employees on the protections afforded by the New Hampshire employment laws and the ADA;

N. Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated him because of discrimination and retaliation; and

O. Grant to Plaintiff such other and further relief as may be just and proper.


Dated: July 26, 2022       /s/ Chad T. Hansen_____
               Chad T. Hansen, NH Bar No. 269340
               Attorney for Plaintiff

               Employee Rights Group
               92 Exchange Street, 2nd Floor
               Portland, ME 04101
               207-874-0905
               chad@employeerightslaw.attorney